# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MOORE EYE CARE, P.C.,** *et al.*, | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 15-cv-05290** |
| | : | |
| **CHARTCARE SOLUTIONS INC.,** *et al.*, | : | |
| **Defendants.** | : | |

## MEMORANDUM

**Rufe, J.**                                                                 **March 7, 2019**

Plaintiffs Moore Eye Care, P.C. and Eye Services, MSO d/b/a Moore Eye Institute (collectively "Moore Eye") provide medical and surgical ophthalmology services.[1] Moore Eye filed suit against its former billing services providers for alleged breaches of a medical billing contract.[2] On September 14, 2018, this case was reassigned to this Court from the docket of the retired Judge Lawrence F. Stengel. Moore Eye, Defendant/Cross-Claim Plaintiff Medical Transcription Billing, Corp. ("MTBC"), and Cross-Claim Defendant ChartCare Solutions, Inc., have each filed motions for summary judgment: MTBC and Moore Eye have filed cross motions for summary judgment on MTBC's breach of contract counterclaims; Moore Eye has moved for summary judgment on MTBC's counterclaims for unjust enrichment and quantum meruit; MTBC has moved for summary judgment on Moore Eye's breach of contract claim; and ChartCare has moved for summary judgment on MTBC's cross-claims. For the reasons that follow, MTBC's motion will be denied, and the motions filed by Moore Eye and ChartCare will be granted in part and denied in part.

---

[1] Pls.' Statement of Uncontested Facts in Supp. Summ. J. [Doc. No. 86] ¶¶ 1-2.

[2] This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(a), because there is diversity of citizenship between Plaintiff and Defendants, and the amount in controversy is greater than $75,000.

## I.    BACKGROUND

While Moore Eye refers to this case as a "straightforward contractual dispute" for which summary judgment is appropriate,[3] the parties' "uncontested" statements of facts reveal significant disputes over the parties' conduct and events on which the motions rely. These disputes are noted in the discussion where relevant.

In December 2012, Moore Eye entered into a billing agreement with i-Plexus Solutions, Inc., under which i-Plexus would provide medical billing services to Moore Eye, and Moore Eye would pay i-Plexus a percentage of its monthly collections.[4] After a merger with i-Plexus, ChartCare, a subsidiary of QHR,[5] became responsible for i-Plexus's obligations to Moore Eye under the existing billing services agreement. Moore Eye alleges that both i-Plexus and ChartCare failed to perform their contractual responsibilities, causing Moore Eye to lose the ability to collect on many of its medical claims, and in 2014, Moore Eye began withholding the monthly fees that were due under the services agreement.[6] MTBC and ChartCare dispute Moore Eye's assertion that the account was mishandled, and ChartCare asserts that many of the issues that have been raised by Moore Eye were outside the scope of ChartCare's responsibility.[7]

On January 26, 2015, a meeting was held between Moore Eye representatives and Michael Halligan, the Vice President of QHR (ChartCare's parent company). Moore Eye alleges that its representatives presented Halligan with evidence of ChartCare's failure to perform its

---

[3] Pls.' Mem. Law Supp. Summ. J. [Doc. No. 86] at 1.

[4] *See* i-Plexus Billing Solutions Contract, Ex. 5 to Pls.' Mot. Summ. J. [Doc. No. 86] ¶ 3.

[5] The parties variously refer to the conduct by QHR's subsidiary, ChartCare, as conduct of SoftCare, ChartCare, QHR, and SoftCare/QHR. QHR is no longer a party to this action. SoftCare has changed its name to ChartCare.

[6] Pls.' Statement of Uncontested Facts in Supp. Summ. J. [Doc. No. 86] ¶¶ 20-22, 24-25.

[7] ChartCare's Counterstatement to Pls.' Statement of Uncontested Facts [Doc. No. 90] ¶¶ 24-25; MTBC's Counterstatement to Pls.' Statement of Uncontested Facts [Doc. No. 91] ¶¶ 24-25.

contractual duties.[8] Moore Eye asserts that in this meeting, Halligan described the handling of the Moore Eye account as "fraud," and that he agreed to waive the entirety of the outstanding balances otherwise due to ChartCare through the end of 2014.[9] Moore Eye agreed in the meeting that it would pay its invoices within 24 hours of receiving them starting in January 2015. MTBC and ChartCare largely dispute Moore Eye's characterization of the meeting, including the allegation that the pre-2015 invoices were waived.[10] After this meeting, however, Moore Eye continued to withhold payment, asserting that ChartCare "continued to fail to perform its duties."[11]

ChartCare and MTBC entered into an Asset Purchase Agreement ("APA") dated July 10, 2015, by which MTBC assumed all responsibilities for the billing contract.[12] MTBC issued an invoice to Moore Eye seeking payment on the outstanding balance, much of which Moore Eye asserted ChartCare had waived.[13] Moore Eye asserts that MTBC, like ChartCare, "failed to engage in reconciliation of billings, follow-up on unpaid payer balances, resolution of payer denials or partial pays, and executive and management reporting regarding charges."[14] MTBC disputes these allegations, and contends that Moore Eye denied MTBC employees access to Moore Eye's server that contained all of its relevant patient information, which effectively prevented MTBC from being able to fully provide billing services.[15]

---

[8] Pls.' Statement of Uncontested Facts in Supp. Summ. J. [Doc. No. 86] ¶ 26.

[9] Mem. of January 26, 2015 Meeting, Ex. 6 to Pls. Mot. Summ. J. [Doc. No. 86].

[10] ChartCare's Counterstatement to Pls.' Statement of Uncontested Facts [Doc. No. 90] ¶¶27-28; MTBC's Counterstatement to Pls.' Statement of Uncontested Facts [Doc. No. 91] ¶¶27-28.

[11] Pls.' Statement of Uncontested Facts in Supp. Summ. J. [Doc. No. 86] ¶ 29.

[12] *See* Asset Purchase Agreement, Ex. 8 to Pls.' Mot. Summ. J. [Doc. No. 86].

[13] Pls.' Statement of Uncontested Facts in Supp. Summ. J. [Doc. No. 86] ¶ 37.

[14] *Id.* ¶ 39.

[15] MTBC's Statement of Uncontested Facts in Supp. Summ. J. [Doc. No. 88] ¶¶ 39-41. Moore Eye disputes MTBC's characterization of the server, and asserts that "Moore Eyes' billing system contained the patient record."

On August 11, 2015, the President of MTBC sent Dr. Ginsburg, the founder of Moore Eye, an email stating that MTBC "cannot continue to allocate resources to [Moore Eye's] account after [August 14, 2015] unless/until we receive a good faith payment of the most recent two months' balance by the end of the week (i.e., Friday, 8/14)."[16] Moore Eye did not issue a payment to MTBC, and MTBC stopped providing services. Moore Eye construes MTBC's email and subsequent actions as a "unilateral termination of services without proper notice,"[17] and MTBC construes its actions as a temporary suspension of the contract.[18]

On August 14, 2015, Moore Eye filed its complaint in the Court of Common Pleas of Delaware County, Pennsylvania, alleging claims for breach of contract and fraud against Defendants, which include ChartCare, QHR, and MTBC. On September 23, 2015, the matter was removed to this Court. All Defendants, except MTBC, have settled with Plaintiff.

On October 29, 2015, MTBC filed an answer, and asserted two cross-claims against ChartCare for indemnification, and counterclaims against Moore Eye for breach of contract, quantum meruit, and unjust enrichment.[19] MTBC's breach of contract counterclaims seek damages for: (1) the amounts due to ChartCare for its services "during the period through June 30, 2015,"[20] which were assigned to MTBC under the APA; (2) the amounts due to MTBC for

Pls.' Response to MTBC's Additional Facts [Doc. No. 99] ¶ 51. Moore Eye also asserts that MTBC did not specify why they were requesting access to Moore Eye's server, and that it did not feel confident giving MTBC access to the server. *Id.* ¶ 62.

[16] Email from Stephen Snyder to Dr. Ginsburg, Ex. 16 to Pls.' Mot. Summ. J. [Doc. No. 86].

[17] Pls.' Statement of Uncontested Facts in Supp. Summ. J. [Doc. No. 86] ¶ 49.

[18] MTBC's Counterstatement to Pls.' Statement of Uncontested Facts [Doc. No. 91] ¶ 43.

[19] MTBC's Answer [Doc. No. 11]. MTBC also asserted a counterclaim for fraud, which has been voluntarily dismissed. [Doc. No. 26].

[20] MTBC's Counterclaims [Doc. No. 11] ¶ 3.

services rendered from July[21] through August 13, 2015; and (3) Moore Eye's allegedly improper termination of the contract without notice.

## II.  LEGAL STANDARD

A court will award summary judgment on a claim or part of a claim where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[22] A fact is "material" if resolving the dispute over the fact "might affect the outcome of the suit under the governing [substantive] law."[23] A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[24]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[25] Further, a court may not weigh the evidence or make credibility determinations.[26] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[27] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[28] This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[29] Therefore, if, after making all

---

[21] In Count II, MTBC asserts that it provided additional services to Moore Eye from July 10, 2015 through August 13, 2015, and that it is owed for the services rendered by ChartCare and MTBC during the period from July 1, 2015 through August 13, 2015. MTBC's Counterclaims [Doc. No. 11] at ¶¶ 6-8

[22] Fed. R. Civ. P. 56(a).

[23] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[24] *Id.*

[25] *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[26] *Boyle v. Cty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

[27] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[28] *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

[29] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[30]

The rule is no different where there are cross-motions for summary judgment.[31] As stated by the Third Circuit, "[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist."[32]

## III.  DISCUSSION

### A. MTBC AND MOORE EYE'S CROSS-MOTIONS FOR SUMMARY JUDGMENT ON MTBC'S COUNTER-CLAIMS FOR BREACH OF CONTRACT

Moore Eye and MTBC have filed cross-motions for summary judgment on MTBC's breach of contract claims, which are based on Moore Eye's failure to pay for services provided by ChartCare and MTBC, and Moore Eye's alleged early termination of the contract in violation of the contract's terms.[33]

Moore Eye contends that each of MTBC's counterclaims for breach of contract fail for three reasons. First, Moore Eye asserts that its refusal to pay the servicers was not a breach, because Moore Eye was entitled to suspend payment when MTBC and ChartCare did not perform their contractual obligations.[34] Second, Moore Eye asserts that it is not liable for the pre-

---

[30] *Wisniewski v. Johns–Manville Corp*., 812 F.2d 81, 83 (3d Cir. 1987).

[31] *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008).

[32] *Id.* (internal quotation omitted).

[33] It appears that MTBC only moved for summary judgment on its counterclaims for breach of contract based on Moore Eye's alleged failure to pay, not its alleged early termination of the contract. *See* MTBC's Mem. Law Supp. Summ. J. [Doc. No. 88] at 16.

[34] Pls.' Mem. Law Supp. Summ. J. [Doc. No. 86] at 9-13.

January 2015 accounts receivable for an additional reason: ChartCare allegedly agreed to write off the entirety of these balances otherwise owed by Moore Eye.[35] Finally, as to MTBC's claim that Moore Eye breached the contract by terminating it without notice, Moore Eye asserts that MTBC, and not Moore Eye, terminated the contract.[36]

MTBC also seeks summary judgment on these counterclaims, asserting that it is undisputed that Moore Eye breached the terms of the billing agreement by refusing to pay the monthly service fees. MTBC asserts that any breach by ChartCare or MTBC did not absolve Moore Eye of its duty to pay, as the record shows that Moore Eye elected to continue performance of the billing agreement regardless of MTBC and ChartCare's alleged breach.[37] As to Moore Eye's contention that the pre-2015 accounts receivable was waived, MTBC has asserted that this was merely an offer by ChartCare that Moore Eye did not accept.[38] Finally, MTBC asserts that it did not impermissibly terminate the contract without adequate notice as Moore Eye contends, but rather that it suspended performance in response to Moore Eye's "unequivocal[] … repudiation of the terms of the billing agreement."[39]

ChartCare asserts that it did not breach the contract, that it never agreed to write off the pre-2015 accounts receivable, and that any such agreement modifying the contract would be void for lack of consideration.[40]

---

[35] *Id.* at 10.

[36] *Id.* at 13-14.

[37] MTBC Mem. Law Supp. Summ. J. [Doc. No. 88] at 10-13.

[38] MTBC's Mem. Opp'n Pls.' Mot. Summ. J. [Doc. No. 91] at 12.

[39] *Id.* at 14.

[40] ChartCare's Mem. Opp'n. Pls.' Mot. Summ. J. [Doc. No. 90] at 2-3. Moore Eye asserts that ChartCare does not have standing to oppose Moore Eye's summary judgment motion because there are no pending claims between Moore Eye and ChartCare. Pls.' Reply Mem. Supp. Mot. Summ. J. [Doc. No. 99] at 5-6. However, as the resolution of this motion implicates ChartCare's potential liability to MTBC pursuant to MTBC's cross-claim seeking indemnification from ChartCare, the Court may consider ChartCare's filing.

Under Pennsylvania law, a cause of action for breach of contract requires: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages."[41] A contract may be modified by oral agreement, and such modification must be proven by "clear, precise, and convincing evidence."[42] Additionally, the parties' "course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance."[43] Here, the Court cannot simply look to the language of the contract given the conflicting evidence as to whether the agreement was modified and the parties' course of performance, thus precluding summary judgment on MTBC's breach of contract counterclaims for either party.

For example, the Court cannot determine as a matter of law whether Moore Eye elected to continue the contract and to obligate itself to pay, despite any alleged breach by the servicers.[44] The record contains some evidence that Moore Eye did elect to continue the relationship, including Dr. Ginsburg's alleged assertion that "Moore Eye will pay QHR within 24 hours after receiving the invoice from QHR starting in January 2015,"[45] and that between July 10, 2015 and August 14, 2015, approximately 1800 claims for payment were submitted on

---

[41] *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004) (internal quotation marks and brackets omitted).

[42] *Fina v. Fina*, 737 A.2d 760, 764 (Pa. Super. 1999); *see also Pellegrene v. Luther*, 169 A.2d 298, 300 (Pa. 1961) ("The oral contract which modifies or changes or cancels a prior written contract must be proved by evidence which is clear, precise and convincing.").

[43] 13 Pa. Stat. and Cons. Stat. § 1303(f); *see also AFCO Cargo PIT LLC v. DHL Exp. (USA), Inc.*, No. 10–1080, 2010 WL 5140622, at *2 (W.D. Pa. Dec. 10, 2010) ("Under Pennsylvania law, a written contract may be modified by subsequent words or conduct.").

[44] "Under basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages. Under no circumstances may the non-breaching party stop performance *and* continue to take advantage of the contract's benefits." *S & R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371, 376 (3d Cir. 1992) (emphasis in original).

[45] Mem. of January 26, 2015 Meeting, Ex. 6 to Pls. Mot. Summ. J. [Doc. No. 86].

Moore Eye's behalf.[46] However, the nature and substance of such a continued contractual relationship is not clear from the record, as there is also some evidence that the contract may have been modified, either pursuant to an oral agreement or the parties' course of performance. Specifically, there is some evidence that the contract was modified pursuant to an oral agreement between Dr. Ginsburg and Mr. Halligan.[47] Additionally, ChartCare continued to provide services to Moore Eye despite Moore Eye's failure to pay, and Dr. Ginsburg has asserted that, when he confronted ChartCare about the negligent handling of the account, "[ChartCare] asked [him] for more time," and that it appeared to him that ChartCare "understood why [Moore Eye] was not paying," and that "Halligan really wanted to try to make it work."[48]

Additionally, the dispute as to the nature of any alleged waiver of the pre-2015 debt by ChartCare precludes any finding, at this stage, as to the viability of a claim seeking payment for any pre-2015 accounts receivable. Moore Eye has produced its summary of the January 26, 2015 meeting stating that Mr. Halligan offered to release Moore Eye's obligation for all pre-2015 outstanding balances as a good faith gesture. ChartCare also continued to provide some services in the absence of payment from Moore Eye. However, the alleged waiver is disputed by both MTBC and ChartCare, and even Moore Eye's meeting summary does not establish the context of any waiver, such as whether it was part of a broader agreement to modify the contract for consideration, or whether any such consideration was satisfied.[49]

---

[46] *See* Spreadsheet of 1890 Claims Uploaded for Moore Eye Ex. 8 to MTBC's Opp'n Pls.' Mot. Summ. J. [Doc. No. 92].

[47] *See* Mem. of January 26, 2015 Meeting, Ex. 6 to Pls. Mot. Summ. J. [Doc. No. 86].

[48] Ginsburg Dep., Ex. 1 to Pls.' Mot. Summ. J. [Doc. No. 86] at 89, 106.

[49] Notably, Moore Eye's summary of the meeting asserts that, after Halligan offered to release Moore's obligation, "Dr. Ginsburg then stated that Moore Eye will pay QHR within 24 hours after receiving the invoice from QHR starting January 2015." Mem. of January 26, 2015 Meeting, Ex. 6 to Pls. Mot. Summ. J. [Doc. No. 86]. The Court cannot determine from the record whether this agreement to pay, which Moore Eye did not conform to, was consideration for a modification by which the pre-2015 accounts receivable would be waived.

These same factual disputes preclude a determination as to whether either party could, or did, terminate the contract without notice.

## B. MOORE EYE'S MOTION FOR SUMMARY JUDGMENT ON MTBC'S COUNTERCLAIMS FOR UNJUST ENRICHMENT AND QUANTUM MERUIT

Moore Eye moved for summary judgment on MTBC's claims of unjust enrichment and quantum meruit. Summary judgment will be granted as to these two claims, as under Pennsylvania law, "the doctrine of quasicontract, or unjust enrichment, is inapplicable where a written or express contract exists."[50] The parties do not dispute the existence of a written contract, and MTBC has not contested Moore Eye's motion on these two claims.[51]

## C. MTBC'S MOTION FOR SUMMARY JUDGMENT ON COUNT I OF MOORE EYE'S COMPLAINT

MTBC moved for summary judgment on Count I of Moore Eye's complaint for breach of contract, primarily relying on the same arguments discussed above.[52] Specifically, MTBC asserts that Moore Eye cannot maintain a breach of contract claim against MTBC because Moore Eye materially breached the terms of the billing contract by failing to pay the amounts due, and that this failure to pay was not justified by any alleged breach by the servicers because Moore Eye elected to continue the billing contract. MTBC also contends that it cannot be liable for suspending services because Moore Eye anticipatorily breached the billing agreement when it informed MTBC that it would not pay for the services. Given the many factual disputes relating to the nature of the contractual agreement and the parties' conduct, and for the reasons stated

---

[50] *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. 2006); *see also Glob. Sourcing LLC v. DBDK Int'l, LLC*, 2018 WL 723098, *5 (E.D. Pa. Feb. 5, 2018).

[51] MTBC has asserted that "[i]n light of Moore Eye's admission that a contract existed between Moore Eye and MTBC, a fact it previously disputed, the issues raised [in the unjust enrichment and quantum meruit counts] are moot." MTBC's Opp'n Pls.' Mot. Summ. J. [Doc. No. 91] at 16.

[52] MTBC's Mem. Supp. Summ. J. [Doc. No. 88] at 10-15.

above, MTBC's motion for summary judgment on the breach of contract claim against it will also be denied.

### D. CHARTCARE'S MOTION FOR SUMMARY JUDGMENT ON MTBC'S CROSS-CLAIMS

MTBC brought cross-claims against ChartCare seeking indemnification for Moore Eye's claims against it. In Count I, MTBC asserts that ChartCare warranted that the Moore Eye receivables were valid obligations, and any alleged agreement to write off the pre-2015 accounts receivable would breach this warranty. In Count II, MTBC seeks indemnification to the extent it is found liable for damages against Moore Eye based on ChartCare's "breaches, acts or omissions."[53]

### i. *ChartCare's Contention That Counts I and II are Premature*

ChartCare asserts that MTBC's claims against it are premature because the APA does not provide a right to indemnification until MTBC sustains damages in excess of $50,000. According to ChartCare, MTBC has not yet sustained any damages because the claims against it are still pending.

By asserting that MTBC's claims for indemnification are premature, ChartCare misconstrues the language of the APA. The relevant article of the APA provides: "The Purchaser will not be entitled to make any Indemnity Claim against the Vendor … until the aggregate amount of all Damages exceeds $50,000 (the "Indemnity Threshold").[54] The APA defines "damages" as "all costs, losses, expenses, liabilities and amounts payable in respect of a claim."[55] ChartCare argues that because the claims are still pending and the damages have not yet been legally determined, MTBC has not sustained "damages" for purposes of the APA.

---

[53] MTBC's Cross-Claims [Doc. No. 11] ¶ 10.

[54] Asset Purchase Agreement, Ex. B. to ChartCare's Mot. Summ. J. [Doc. No. 87] § 6.3(b)

[55] *Id.* § 1.1(s).

However, a plain reading of these two provisions confirms that damages need only be "payable," and not legally determined, for purposes of the indemnity threshold.[56] Here, MTBC has alleged that ChartCare's alleged conduct has caused it losses in excess of $50,000.[57] Therefore, the cross-claim is not premature, and summary judgment will not be granted on this ground.

ii.  *Count I of MTBC's Cross-Claim*

ChartCare seeks summary judgment on Count I of MTBC's cross-claim, asserting that MTBC cannot offer "clear and convincing" evidence that ChartCare orally modified its service agreement with Moore Eye.[58] However, as previously stated, the record contains disputed evidence of an agreement by which the pre-2015 accounts would be waived, including ChartCare's own conduct of continuing to provide services after the meeting with Dr. Ginsburg despite not being paid.

ChartCare also asserts that Count I should be dismissed because ChartCare did not guarantee MTBC's ability to collect the Moore Eye Receivables, and instead "expressly disclaimed the collectability of the Moore Eye Receivables in the APA and provided for the possibility that Moore Eye would seek to reduce or eliminate entirely any amount owed."[59] In support, ChartCare relies on Article 3.1(e) of the APA, which states:

> All existing accounts receivable of the Vendor: (i) represent valid obligations of customers of the Vendor arising from bona fide transactions entered into in the Ordinary Course of Business; and (ii) except for Moore Eye, are current and, to the Vendor's

---

[56] The parties agree that the APA is governed by Canadian law, under which words are to be given their literal meaning "where that meaning is unambiguous … is not excluded by the context, and is sensible with reference to the extrinsic circumstances in which the writer was placed at the time of writing." *Cruise Connections Charter Mgmt. 1, LP v. Attorney General of Canada*, 967 F. Supp. 2d 115, 221 (D.D.C. 2013) (internal quotations and citation omitted).

[57] *See* MTBC's Cross-Claims [Doc. No. 11] ¶¶ 1-7.

[58] An oral modification of a written contract must be proven by "clear, precise and convincing evidence." *Fina v. Fina*, 737 A.2d 760, 764 (Pa. Super. 1999).

[59] ChartCare's Mem. Supp. Summ. J. [Doc. No. 87] at 1-2.

knowledge and without independent inquiry, will be collected in full (without any counterclaim or setoff).[60]

The APA addresses the Moore Eye account specifically in other provisions as well: Article 2.6 provides that MTBC was only obliged to pay ChartCare for the Moore Eye Receivables to the extent it was able to collect them,[61] and Article 7.2 allows MTBC to provide a partial credit against the Moore Eye accounts receivable to induce Moore Eye to sign a new service agreement.[62]

Although the APA distinguishes the Moore Eye account from those that were "current" and would be "collected in full," ChartCare warranted that the Moore Eye account represented a "valid obligation[]."[63] Therefore, the dispute as to the Moore Eye account's validity, given the alleged waiver of the pre-2015 accounts receivable, precludes summary judgment.

### iii.  *Count II of MTBC's Cross-Claim*

ChartCare also moves for summary judgment on Count II, in which MTBC seeks indemnification for "damages sustained by Moore Eye as a result of contractual breaches, acts or omissions by [ChartCare]."[64] ChartCare argues that this claim fails as it is based on an alleged breach of a contract between ChartCare and Moore Eye, and the APA only provides indemnification from third party claims where the damages are caused by ChartCare's breach of the APA.[65] Moreover, ChartCare asserts that Moore Eye is suing MTBC for MTBC's own

---

[60] Asset Purchase Agreement, Ex. B. to ChartCare's Mot. Summ. J. [Doc. No. 87] § 3.1(e).

[61] *Id.* § 2.6(a)(iv) ("… the Purchaser will pay … 50% of any Moore A/R collected…").

[62] *Id.* § 7.2.

[63] *Id.* § 3.1(e).

[64] MTBC's Cross-Claims [Doc. No. 11] at ¶ 10.

[65] ChartCare's Mem. Supp. Summ. J. [Doc. No. 87] at 12-13.

conduct, not ChartCare's conduct, and that, regardless, MTBC did not assume liability for ChartCare's conduct.[66]

In response, MTBC asserts that ChartCare provided all of the billing services that Moore Eye claims were deficient and for which MTBC is being sued. Specifically, during the period following the execution of the APA, ChartCare's employees were still performing all the work on Moore Eye's account in accordance with the APA's provision that ChartCare employees would assist MTBC in transitioning the acquired accounts, and because Moore Eye refused to grant MTBC's employees access to the Moore Eye server.[67]

MTBC fails to explain how any ineffectiveness in ChartCare's provision of services would give rise to a claim of indemnification against them. The provision of the APA that MTBC refers to only provides that ChartCare "will permit those other employees [who were not transferred to MTBC] … to support the transition of the Purchased Assets to Purchaser."[68] MTBC does not contend that ChartCare failed to permit its employees to support MTBC's work, nor does MTBC cite any other provision in the APA that ChartCare's conduct after the APA's execution would have breached. As the APA only provides for indemnification where ChartCare breached its terms, and MTBC has not shown that ChartCare's conduct after the execution of the APA constituted such a breach, summary judgment will be granted as to Count II of MTBC's cross-claim against ChartCare, which will be dismissed.

IV.     **CONCLUSION**

For the reasons stated above, MTBC's motion for summary judgment will be denied. ChartCare's motion for summary judgment and Moore Eye's motion for summary judgment will

---

[66] *Id.* at 13 (citing APA § 1.1; § 2.2).

[67] MTBC's Mem. Opp'n ChartCare's Mot. Summ. J. [Doc. No. 95] at 11-12.

[68] Asset Purchase Agreement, Ex. B. to ChartCare's Mot. Summ. J. [Doc. No. 87] § 7.3.

be denied in part and granted in part. MTBC's counterclaims for quantum meruit and unjust enrichment are dismissed, and Count II of MTBC's cross-claim is dismissed. An Order follows.